In the Matter of the Application of RUDHLAN AMUSEMENT COR-
PORATION, Petitioner, for a Peremptory Order of Mandamus
Directed to JAMES F. GERAGHTY, Commissioner of Licenses of
the City of New York, Respondent.

Supreme Court, New York County, September, 1932.

*Reit & Kaminsky* and *William Weisman,* for the petitioner.

*Arthur J. W. Hilly, Corporation Counsel [Gerald de Waltoff, Jr.* of counsel], for the respondent.

SHIENTAG, J.  This is an application by the Rudhlan Amusement Corporation for a peremptory order of mandamus requiring the commissioner of licenses of the city of New York to issue forthwith to the petitioner a theatre license for the Eltinge Theatre.

The petitioner alleges that it is a lessee of the Eltinge Theatre, located at 236 West Forty-second street, in the borough of Manhattan, city of New York, where it has been operating and conducting theatrical performances of the character known as " burlesque;" that prior to May 1, 1932, such performances were operated under a license issued by the commissioner of licenses; that prior to May 1, 1932, petitioner filed with the commissioner an application for a renewal of its theatre license and offered to pay the required statutory fee; that it has complied with all the requirements of the building, fire, police and other municipal departments; that when its license expired on May 1, 1932, it continued conducting theatrical performances at the Eltinge Theatre with the permission of the commissioner; that on September 19, 1932, the petitioner's application for a renewal was denied, the following notice being received:

" Your application for a renewal of license for the Eltinge Theatre is hereby denied. .

" JAMES F. GERAGHTY,
" *Commissioner.*"

That there has been no conviction of the petitioner or of any of its officers, employees or performers for operating or taking part in any lewd, immoral or obscene play or exhibition.

The replying affidavit of the commissioner of licenses admits the allegations contained in the petition as substantially correct, except that he denies that the police department approved the petitioner's application, and he attaches the disapproval of that department. It further recites that when petitioner's application for a license was presented, the commissioner received objections from neighborhood associations, banks, clergymen, business concerns and citizens in general, and from the police commissioner, all protesting against the renewal of the license on the ground that the performances conducted in the theatre were lewd, lascivious and obscene, and that the performances and the manner in which the theatre was operated tended " to create disorder and to destroy the neighborhood and property values, to cause objectionable characters to congregate in and about the theatre and in the streets in the vicinity thereof, to the detriment of the property and the destruction of the morals and character of the locality and the community in general;" that as a result of these complaints and in accordance with the provisions of chapter 14, article 1, section 5, of the Code of Ordinances of the City of New York, he held hearings on the application over a protracted period of time and called witnesses, who testified to their objections under oath; that at these hearings counsel representing the petitioner were present and given full opportunity for cross-examination and for the production of witnesses on its behalf; that in the course of the hearings the commissioner directed inspectors from his department to visit the theatre and examine the conditions therein prevailing. The testimony of these inspectors was given at the hearings and they were subjected to cross-examination by counsel for · the petitioner. The commissioner submits as part of his affidavit the minutes of the hearings, consisting of some 1,500 pages of testimony and numerous exhibits, and concludes by asserting that in denying the application for a renewal of the license he fairly, reasonably and impartially exercised the discretion reposed in him by law, and that his conclusion was based upon the reasonable ground and the belief that the granting of the license would result in endangering public morality and the decency, safety and welfare of the community.

In support of the application for a peremptory order of mandamus the petitioner contends:

*First.* That an application for a renewal of a license stands on a different basis from an application for an original license, and

that the denial of an application for renewal is tantamount to a revocation by the commissioner of licenses.

*Second.* That under the law the commissioner of licenses has no power to revoke a theatre license.

*Third.* That even if the application for renewal be treated on the same basis as an application for an original license, the commissioner has no discretionary power to refuse a license for a theatre, if the specific provisions of law applicable thereto have been complied with.

*Fourth.* That in any event, the action of the commissioner in refusing the application was tyrannical, arbitrary, unreasonable and based upon false information.

*Fifth.* That assuming that the commissioner of licenses had discretionary powers, the applicant was entitled under the law to the independent, unbiased judgment of the commissioner and that in this instance his action was based solely on a direction received by him from his superior, the mayor of the city, to refuse the license.

This application again calls attention to the unsatisfactory condition of the laws and ordinances relating to the granting and revocation of licenses in the city of New York and to the many obscure and conflicting provisions of law on the subject, and emphasizes the necessity of a recodification and revision of these statutes and ordinances, to the end that anachronisms may be removed therefrom, conflicts eliminated, and that they may be brought into harmony with modern conditions and the needs of a great cosmopolitan community.

The question as to the lack of power of the commissioner of licenses to revoke a theatre license was definitely passed upon in 1922 by the Appellate Division of this department in *Woods Theatre* v. *Gilchrist* (200 App. Div. 128). There the commissioner of licenses revoked the license of the Eltinge Theatre on the ground that the play " Demi-Virgin," which was produced in the theatre, was an indecent, lewd and obscene production. After an analysis of the laws relating to the subject, the Appellate Division came to the conclusion that from an early date there was a distinction made in the law between the power to issue a theatre license and the power to revoke, the power to issue being conferred first upon the mayor, then upon the police commissioner, and finally upon the commissioner of licenses. The power to revoke, on the other hand, from the very beginning, was expressly delegated to a justice of a court of record, for causes specified in the statute, among which the lewd or obscene character of the production was not included. Thereupon the Appellate Division certified the following ques-

tion to the Court of Appeals: " Has the commissioner of licenses of the city of New York power to revoke a license of a theatre where dramatic performances or other entertainments of the stage are exhibited? " The Court of Appeals in a memorandum decision, without opinion, and by a vote of four to three, answered in the negative (233 N. Y. 616).

Since these decisions, section 1140-a of the Penal Law, in relation to immoral plays, was amended so as to provide that in case of a conviction for a violation of that section, the licensing authority would have power to revoke the theatre license upon proof of the conviction, and that upon such revocation, the licensing authority was empowered to refuse to issue a new license for the theatre for a period not exceeding one year from the date of the revocation. (Laws of 1927, chap. 690, as amd. by Laws of 1931, chap. 668.) So that at the present time the commissioner of licenses has power to revoke a theatre license only after a conviction for violation of the provisions of section 1140-a of the Penal Law and a justice of a court of record has a certain limited power to revoke such license for specified violations, none of which bears upon the character of the exhibition. If the petitioner is correct, therefore, in his contention that a refusal to renew a license is tantamount to a revocation, the commissioner of licenses clearly exceeded his powers under the law, and the peremptory order must issue. But I fail to see on what theory the petitioner's contention can be sustained.

There is no specific provision in the licensing law relating to the renewal of a theatre license. An original license is issued for one year. At the end of that time an application for a new license must be made. The license is granted and lasts for one year and no longer. When the year expires it is gone. In England, although a statute contained express provisions dealing with the renewal of a license, the court held that " a renewed license was simply a new license, though it happened to be granted to an already licensed person and in respect of the same premises." (*Sharpe* v. *Wakefield*, L. R. [21 Q. B. Div.] 66, 75.) Every application for what is called a renewal of a license was held to be exactly the same in all its legal incidents as an application for a new license.

That being so, the next question is whether under the law the commissioner of licenses has any discretionary power with respect to the issuance of a theatre license, and if so, what, broadly speaking, are the limits of that discretion.

The petitioner contends that the commissioner of licenses lacks discretionary power to refuse to issue a theatre license; that upon payment of the license fee and upon proof of compliance with the

specific provisions of the statute, notably the fire and building laws, he is bound to issue the license. In support of this contention petitioner points out that in the case of motion picture exhibitions the commissioner is specifically empowered to inquire into the character of the applicant and into the character of the exhibitions, and that in applications for licenses for certain trades and occupations he is expressly authorized to inquire into the fitness of the applicant. From the silence of the statute on the subject of theatre licenses, it is sought to draw the inference that no such power of preliminary inquiry exists.

This, however, loses sight of the history of legislation affecting the issuance of licenses for theatres in New York city and the court decisions thereunder. As far back as 1829 it was provided that " No theatre or circus, or building for exhibiting theatrical or equestrian performances in the city of New York shall be opened for such exhibitions after the first day of May next, unless the manager or proprietor thereof shall annually obtain from the mayor of the said city, a license therefor; which license the said mayor is authorised to grant, to continue until the first day of May ensuing the grant thereof." (Laws of 1829, chap. 302, § 4.)

It is of interest that the same license fee which was required in 1829, the sum of $500, is that fixed by law today (Laws of 1829, chap. 302). This section, with its various amendments, is substantially the same as the present sections 1472 and 1473 of the Greater New York Charter, except that in the meantime the authority and power to issue licenses for theatres was taken in the first instance from the mayor and given to the department of police (Laws of 1897, chap. 378, § 346), and subsequently transferred to the commissioner of licenses, when a department of licenses for the city of New York was established (Laws of 1914, chap. 475). From its inception, the provision for the licensing of theatres was regarded not in the nature of a revenue producing measure, but rather as a regulatory statute. In the Laws of 1829, chapter 302, to which reference has been made, it was provided that the sums received for license fees " shall be paid over to the treasurer of the society for the reformation of juvenile delinquents in the city of New York for the use of said society," a provision which later was eliminated. In 1874 this regulatory feature of the law was emphasized by the General Term of the Supreme Court of this department in the case of *Wallack* v. *Mayor* (3 Hun, 84, 96), in which the court said: " * * * It might be no difficult task to show that the system of licenses, and its subsequent preclusion of unworthy exhibitions, from which license is or ought to be withheld, is greatly advantageous to such establishments as the plaintiff's,

by preventing the degradation of all such performances in the public estimation, which would be quite certain to grow out of the promiscuous and unrestrained exhibitions which would spring up in the absence of legal restrictions."

In 1890 the General Term of the Supreme Court of this department, in the case of *People ex rel. Worth* v. *Grant* (58 Hun, 455), was called upon to consider the power of the mayor of the city with respect to the issuance of theatre licenses under statutes substantially similar to those now in force.

The court had before it the question as to whether upon tender of the fee specified in the statute the applicant was entitled, as a matter of right, to the license asked; whether the duty imposed upon the mayor with respect to the issuance of licenses for theatres was imperative or discretionary. It was there contended, as here, that the words in the statute " authorized and empowered " to issue a license should be construed as mandatory. The court, however, held otherwise, saying: " What public interest demands that the mayor should be required under all circumstances to accept the fee and grant the license? It seems to me that it is quite the other way. The public good clearly requires that the permissive words in question should be read in their natural and ordinary sense." The court further said: " It would, indeed, be a remarkable construction, subversive of the entire object sought to be attained by the act, which would compel the mayor to license an avowedly indecent exhibition or a disorderly place of entertainment. The relator insists that even under such circumstances the license must be granted, and that the only remedy is to treat the exhibition as a nuisance, and check it by the operation of the criminal law. This, however, would be entirely inadequate. The purpose disclosed or ascertained might be grossly immoral and yet outside the Penal Code." (*People ex rel. Worth* v. *Grant*, 58 Hun, 455, 457, 458.) In that case, as here, the relator laid stress upon the fact that the license was not for the entertainment itself but for the place where it is to be given. The court held that the language of the statute, the same then as it is today, provided that the license was " for the place of such exhibition for such purpose, that is, for the purpose of the proposed entertainments," but that " even if the mayor's authority were limited to the place, without regard to the purpose, his discretion remains." (Id. 458, 459.)

A similar construction was placed upon the statute after the power to issue theatre licenses was transferred from the mayor to the police commissioner. In 1901 the Appellate Division of this department held that section 1473 of the charter, which provided that the police department was " authorized and empowered "

to grant such licenses, did not impose upon the police commissioner an imperative duty to grant the license upon receipt of the fee, but vested in him a discretionary power which was not controllable by mandamus. (*Matter of Armstrong* v. *Murphy*, 65 App. Div. 123.) In 1909 the same result was reached by the Appellate Division of the Second Department, the court holding that the granting of a concert hall license — and the same provisions related to concert halls as to theatres — by the police commissioner of the city of New York is discretionary and that mandamus does not lie. " This rule is varied only when the action of the board or person vested with the power of issuing a license is arbitrary, tyrannical or unreasonable, or is based upon false information." (*People ex rel. Rota* v. *Baker*, 136 App. Div. 7.)

Ultimately the question as to whether the words of a licensing statute are mandatory or discretionary is a matter of legislative intention to be gathered in the light of all the circumstances, having regard to the purposes sought to be accomplished by the regulatory legislation. Even in the face of mandatory words in a statute, courts in a proper case have sanctioned the exercise of a measure of discretion. (*Matter of Dr. Bloom, Dentist, Inc.*, v. *Cruise*, 259 N. Y. 358.)

The present statute prohibits an exhibition to the public in any building of any stage entertainment " until a license for the place of such exhibition for such purpose shall have been first had and obtained as hereinafter provided." (New York Code of Ordinances, chap. 3, art. 1, § 1.) Under section 2 the commissioner of licenses " is hereby authorized and empowered to grant and issue the license referred to in the preceding section, to continue in force until the first day of May next ensuing the grant thereof, on receiving for each license so granted, and before the issuing thereof, the sum of $500."

The language of the statute just quoted is identical with that used in the preceding legislation mentioned, which was construed by the courts as vesting the licensing authorities with discretion. With the interpretation by the courts in mind, the fact that the Legislature in subsequent revisions failed to vary the previous language used, is a clear intimation that the construction by the courts accorded with the legislative view of correct public policy.

It is contended that it is not sound policy to give discretionary powers with respect to the issuance of theatre licenses to a subordinate official such as the commissioner of licenses rather than to a board. That is a matter, not for the courts, but for the Legislature, State or municipal. Originally the power of censorship — and I use that term in its real technical significance — over motion

pictures was given by the Legislature to a commission. Subsequently it was transferred to the State Department of Education, placed in the hands of a director of a division subject to review by the Board of Regents, but with power to the Board of Regents to designate the Commissioner of Education or a Deputy Commissioner to act as the reviewing officer (Laws of 1927, chap. 153). Many instances may be pointed out where broad discretion in matters of important public concern has been conferred upon individual officers, municipal or State, and the grant sustained by the courts. (*Matter of Agoglia* v. *Mulrooney*, 259 N. Y. 462.)

It is further urged that there is no requirement for a hearing by the commissioner of licenses in passing on an application for a theatre license. Chapter 14, article 1, section 5 of the Code of Ordinances reads as follows: " The commissioner when investigating any matters pertaining to the granting, issuing, transferring, renewing, revoking, suspending or cancelling of any license, is hereby authorized in his discretion to take such testimony as may be necessary on which to base official action. When taking such testimony, he may subpœna witnesses and also direct the production before him of necessary and material books and papers."

The respondent contends that this provision applies to theatre licenses. Even if it should be held that it does not, because of its peculiar place in the Code of Ordinances, the fact is that the commissioner of licenses did hold hearings on the application, did investigate complaints, did examine witnesses and did afford to the petitioner the widest opportunity for cross-examination and for the production of testimony in support of his application. The courts have sustained the exercise of discretionary power by a municipal officer, even in the absence of a requirement for a hearing. The commissioner of licenses, for example, was sustained in his control of the character of motion picture exhibitions, although he was not required to hold a hearing. (*Message Photo-Play Co.* v. *Bell,* 179 App. Div. 13.)

Finally, it is urged that the absence of an express provision for court review indicates that the Legislature could not have intended to intrust an administrative official with discretionary powers concerning such important matters of public interest. There was no provision for court review in the statute upon which the controversy in the case last cited was based; yet discretionary power in the commissioner was held to exist. Nor is there express provision for court review upon refusal by the police commissioner of applications for dance hall licenses. Nevertheless, the courts have recognized that such discretionary power resides in him. Wiser it would perhaps be to revise the statutes affecting licenses

so as to incorporate provisions for court review into the law. This, however, is a matter of legislative policy, and not for the courts to determine. Even in the absence of specific provision for court review, an applicant is not without redress if the action of the licensing authority was arbitrary, tyrannical, unreasonable or based upon false information. (*People ex rel. Lodes* v. *Department of Health*, 189 N. Y. 187.)

Clearly then the commissioner of licenses is not a mere automaton when it comes to the granting of theatre licenses. He has a certain measure of discretion. The court in this instance is not called upon, nor is it possible, to define precisely the scope and the limits of this discretionary power. The commissioner is not a censor of plays. He does not claim to be and so stated on numerous occasions in the course of the public hearings. It is significant that among those who appeared in opposition to the granting of the license in question there were some who professed to be opponents of dramatic censorship. As a matter of fact, theatres, with rare exceptions, are licensed on May first of each year for stage productions generally. The commissioner, moreover, makes no claim that " burlesque " shows as a class should be prohibited.

On an application for a peremptory mandamus the court must assume the truth of the testimony given at the hearings before the commissioner on which he based his action. While many appeared before him in support of the applications and in defense of the character of the performances, there was evidence from others that the performances were not only coarse and vulgar, not only indecent, but immoral and lewd. The shows were changed weekly, but at all times there were special features which involved a " lascivious display of female charms," the direct tendency of which was " to excite lustful and lecherous desire." (*People* v. *Wendling*, 258 N. Y. 451.) Some arrests were made, resulting in discharge by the magistrates. The deputy police commissioner testified at the hearing: " These theatres have given the commissioner so much trouble that he asked me to come here to oppose in his behalf the reissuance of these licenses." The type of production, with the lewd scenes that have been mentioned, the vulgar titles given to the plays and exhibited outside the theatre, the character of the pictures reproduced in large numbers outside the theatre, the sale of lascivious literature in the theatre — all these facts were testified to before the commissioner, and if true, were sufficient to justify his refusal to renew the license, not indeed as a censor of the weekly plays produced but in the exercise of a sound discretion that the conduct and operation of the theatre itself were offensive to public morals, public decency and the welfare of the community.

It is urged that to allow the commissioner of licenses to wield this power is to establish some form of censorship. Resort to such a label serves no useful purpose. It certainly is not a censorship within the historical or popular meaning of that term. It may be that in the last analysis it is all a question of degree, but in the eyes of the law, as in the ordinary affairs of life, a difference in degree may often constitute a difference in kind.

The petitioner complains of what he calls unfair discrimination. He asserts that conditions in the Eltinge Theatre were no worse than those prevailing in some other theatres. Assuming that to be so, it forms no ground for the relief here asked. The responsibility for the continuance of such conditions rests squarely with the municipal authorities.

Petitioner claims that the commissioner of licenses arrived at no independent decision of his own, but acted solely by direction of his superior officer, the mayor of the city of New York. Nothing is submitted in affidavit form on this point; the court is asked to take judicial notice of a statement alleged to have been given out by the mayor to the press. The applicant was unquestionably entitled to the unbiased and independent judgment of the commissioner. Whether such judgment was in fact exercised is not a matter for determination on petition for a peremptory order of mandamus.

Finally, it is urged that the commissioner acted arbitrarily; that his decision was to take effect immediately and that in his notification he assigned no reasons for his refusal to grant the license. While the proper practice is for an administrative officer who refuses a license to state generally the reasons for his refusal, the failure to do so would not, as a matter of law, constitute arbitrary action on the part of the commissioner, particularly in view of the fact that throughout the long and protracted hearings he indicated repeatedly the basis on which he would take action. The failure to grant the applicant some time in which to readjust its affairs after the application had been denied does not in and of itself constitute such arbitrary action as to warrant interference by the court, since it appears that the applicant was permitted to operate without a license for a period of over four months, before action was taken.

I conclude that, in view of all the circumstances in this case and under the authorities, the commissioner of licenses had discretionary power to take the action complained of.

The courts will not constitute themselves arbiters of administrative conduct unless it clearly appears to be unlawful.

" In the government of the affairs of a great municipality many

powers must necessarily be confided to the discretion of its administrative officers, and it can be productive only of mischief in the treatment of such questions to substitute the discretion of strangers to the power in place of that of the officers best acquainted with the necessities of the case and to whom the legislature has specially confided their exercise." (*People ex rel. Schwab* v. *Grant*, 126 N. Y. 473, 482.)

All that the petitioner is entitled to is an opportunity to submit evidence in court on the questions of fact in dispute, to prove that the commissioner's refusal was arbitrary or unreasonable or based on false information. This it may do by means of an alternative order of mandamus.

The motion for a peremptory order of mandamus is accordingly denied. An alternative order will be granted and the cause set down for a day certain for early trial. The questions involved being similar, the same disposition is made of the application of Edwin Rowland, manager of the Republic Theatre, for a peremptory order of mandamus, directed to the commissioner of licenses. Settle order.